THE BUHL IRON WORKS v. ROBERT C. TEUTON, EDWARD MCWILLIAMS, AND PATRICK H. MONAHAN.

*Fraudulent conveyances—Sale—Chattel mortgage—Change of possession—Delivery—Property in hands of third person—Statute of frauds—Warehouseman.*

| 67 | 623 |
| 92 | 164 |
| 67 | 623 |
| 111 | 424 |
| 67 | 623 |
| 119 | 545 |
| 67 | 623 |
| s35NW | 804 |
| 133 | 1 75 |

1. In the absence of immediate delivery and actual and continued change of possession on an *actual* sale of personal property, such sale is presumptively fraudulent as to creditors, which presumption becomes *absolute*, unless the purchaser makes it appear that it was made in *good faith*, and without any intent to defraud creditors.

2. A mortgage, or bill of sale intended as security, of personal property, where there is no immediate delivery and actual and continued change of possession, is *absolutely void* as to creditors who have obtained liens thereon, or who become such after the giving of the security, unless such conveyance is filed in the proper office, regardless of any question of good faith or honest intent.

3. The delivery of personal property required by the statute of frauds must be such as the articles are capable of, and, if in the possession of an agent, he must be notified of the sale, and, unless he consents to act as the agent of the purchaser, the property ought to be actually taken possession of by such vendee (*Sheldon v. Warner*, 26 Mich. 403; *Carpenter v. Graham*, 42 Id. 191); but, in case of the agent's non-consent and retention of possession, he will become the vendee's agent by operation of law (*Hodges v. Hurd*, 47 Ill. 363).

4. The statement that a sale or the mortgaging of goods in the hands of a third person is good without *actual* delivery refers to cases where such possession is adverse, so that no better delivery can be made.

5. A warehouseman with whom personal property is stored at time of its sale is, in one sense, the vendor's agent, and to constitute a change of possession he must at least be notified of the sale, and will thereafter hold possession for the purchaser.

Error to Wayne. (Jennison, J.) Argued October 25, 1887. Decided January 5, 1888.

Replevin.   Defendants bring error.   Reversed.   The facts are stated in the opinion.

*Brennan & Donnelly*, for appellants.

*Meddaugh, Driggs & Harmon*, for plaintiff.

CHAMPLIN, J.   The plaintiff and defendants were unsecured creditors of the Detroit Tug & Transit Company.

The plaintiff is a corporation, and the defendants are copartners doing business under the firm name of Teuton, McWilliams & Co.

The indebtedness to the plaintiff was evidenced by two promissory notes, due on the sixth and eighth of January, 1886, respectively, for $1,000, and payable at the Detroit National Bank.

The plaintiff claims that on the eighth of January, 1886, it purchased the property in dispute,—consisting of one 12-inch rotary steam-pump, built by the Silsby Manufacturing Company; seven pieces of suction pipe; one strainer; one slip-joint; one steel portable boiler, built by the Eagle Iron Works; one box of tools and connections, complete, used with said boiler,—and gave in payment therefor the two promissory notes above mentioned.

A bill of sale of the property was executed, and delivered to plaintiff, in the following form:

" DETROIT, January 8, 1886.

"BUHL IRON WORKS,

" Bought of DETROIT TUG AND TRANSIT CO.

1 12-inch rotary steam-pump, with suction pipe, strainer,
  tools, and connections, complete,

1 steam-pump, boiler, and outfit, complete, now stored
  in warehouse foot of 3d street,_____ $2,000

" Received payment, January 8, 1886.

" DETROIT TUG AND TRANSIT CO.,<br>" Per S. A. Murphy, President."

The property was stored in a warehouse owned by Chesebrough & Co.

· It was further claimed that the Morton Truck Company was ordered to send a truck to the warehouse and deliver the property to the Buhl Iron Works at its shops on Third street.

At the time the bill of sale was made out, the Detroit Tug & Transit Company was pretty well in debt to other parties, and among them the defendants, Teuton, McWilliams & Co.

It further appeared that the transit company had the warehouse rented for two years, and the pumps and boiler had been put in there at the close of navigation, and the transit company stored them there when not in use. Both pump and boilers were on wheels, and could be readily removed from the warehouse. Chesebrough & Co. had a claim for storage on this property, at this time, for $383.90, but this amount was disputed by the transit company. When the Morton Truck Company went to the warehouse for the property, Mr. Chesebrough refused to deliver it, for the reason that Chesebrough & Co. had a claim for storage amounting to $383.90, and they did not deliver it.

The property remained in the warehouse, and on the eleventh day of February, 1886, the defendants commenced a suit in attachment against the Detroit Tug & Transit Company, and attached the property covered by the bill of sale. Judgment was regularly entered September 16, 1886, and execution issued, which was levied upon the same property, and it was advertised and sold, subject to the charges of Chesebrough & Co. for storage, to defendants. The defendants paid the warehouse charges, and afterwards removed the property, and rented it to other persons.

It further appears from the testimony that neither the Detroit Tug & Transit Company nor the Buhl Iron Works notified the warehousemen that the property had been sold by the one, or purchased by the other.

There was testimony tending to prove that the bill of sale was given as security for the indebtedness of the Detroit Tug & Transit Company to the Buhl Iron Works, and that the

67 MICH.—40.

original indebtedness was never discharged; that it was arranged and agreed that the Detroit Tug & Transit Company could have the property back on paying the Buhl Iron Works the said indebtedness; that a settlement was had, and by agreement made with Mr. Murphy, the president of the transit company, the property was reconveyed, not to the Detroit Tug & Transit Company, but to the Detroit Tug & Wrecking Company.

This agreement was perfected about the time the suit in replevin in this case was commenced, although the understanding had existed for a long time previously.

The Buhl Iron Works, before bringing suit, made demand of the defendants of the property, but did not offer to pay any warehouse charges.

The court instructed the jury that if they were satisfied that the bill of sale was made in good faith, and without any design or intent to defraud the defendants, or other creditors of the tug company, the plaintiff was entitled to recover, subject to the payment of the lien of the warehousemen; that even though the so-called bill of sale was a mortgage, yet as the property when it was sold to the Buhl Iron Works was in the hands of a third party, namely, in the hands of a warehouseman, it was not necessary to file the bill of sale in the clerk's office, and that therefore the question of notice was not raised.

He, however, permitted the defendants to submit to the jury the following question:

"Was the transfer of the property to the Buhl Iron Works a sale outright, or was it given as security?"

The jury retired, but returned into court, and said they could not agree upon the special question. The court then withdrew the question from them, and they thereupon returned a verdict for the plaintiff, subject to a lien in favor of the defendants for the storage claim. The amount of such lien they did not find.

The defendants' counsel, previous to the charge of the court to the jury being given, requested the court to instruct the jury as follows:

"1. If the jury find, from the evidence, that the transfer of the steam-pump and boiler in question was as a security for the indebtedness, then the right of the Buhl Iron Works is that of a mortgagee, and the instrument should have been filed in the city clerk's office, and, unless it was so filed, defendants are entitled to recover.

"2. The jury is further instructed that, even though the paper purporting to transfer the pump and boiler to the Buhl Iron Works may be in form a bill of sale, yet it may be shown by parol testimony that the transfer was intended as security. The surrender of the notes (if they were surrendered) on the making of the bill of sale is not conclusive that it was a sale.

"3. If the Buhl Iron Works retained its claim against the Detroit Tug and Transit Company, and did not discharge it therefrom, and took the bill of sale with the understanding that, on the payment of the two notes and the open account, the Detroit Tug and Transit Company could have the pump back, then you may find that the transfer was given as a security.

"4. You are further instructed that the testimony given in the case would warrant you in finding that the bill of sale was given as a mere security, and you may consider all the circumstances of the case in arriving at your verdict."

The legal points involved in the case will be clearer if I quote two sections of our statute relative to fraudulent conveyances.

Section 6190, How. Stat., enacts:

" Every sale made by a vendor of goods and chattels in his possession, or under his control * * * [See *Cooper v. Brock*, 41 Mich. 491, 492], unless the same be accompanied by an immediate delivery, and to be followed by an actual and continued change of possession, of the things sold, * * * shall be presumed to be fraudulent and void, as against the creditors of the vendor, * * * or subsequent purchasers in good faith, and shall be conclusive evidence of fraud, unless it shall be made to appear, on the part of the persons claiming under such sale, * * * that the same was made in good faith, and without any intent to defraud such creditors or purchasers."

Section 6193, How. Stat., provides:

"Every mortgage, or conveyance intended to operate as a mortgage, of goods and chattels, which shall hereafter be made, which shall not be accompanied by an immediate delivery, and followed by an actual and continued change of possession, of the things mortgaged, shall be absolutely void, as against the creditors of the mortgagor, and as against subsequent purchasers or mortgagees in good faith, unless the mortgage, or a true copy thereof, shall be filed in the office of the clerk of the township or city clerk of the city * * * where the mortgagor resides," etc.

These sections of the statute are intended to provide against two classes of frauds. The first section relates exclusively to *absolute* sales and assignments; and the latter, to conveyances intended as *security* merely. In the case of an absolute sale, where there is no immediate delivery and actual and continued change of possession of the property sold, the sale is presumptively fraudulent merely, as to creditors; which presumption becomes absolute, unless the purchaser makes it appear that the sale was made in good faith, and without any intent to defraud creditors.

Under the section last cited, the mortgage, or conveyance intended as security, of property, where there is no immediate delivery and actual and continued change of possession, is actually void as to creditors who have obtained liens upon the property, or who became such after the giving of the security, unless such conveyance is filed as provided in the statute. Under this section the question of *good faith* and *intent* is immaterial.

Whether, therefore, the bill of sale from the Detroit Tug & Transit Company to the Buhl Iron Works was an absolute sale, or a mere security for debt, was one of great importance, as it respected the rights of the parties. If it was an absolute sale, good faith, and absence of intent to defraud creditors, would have excused immediate delivery; but if a mortgage, without immediate delivery or filing it was void as against defendants.

The court, however, charged the jury that it was immaterial whether it was an absolute sale or a mortgage, because,

the property being in the hands of a warehouseman, no immediate delivery in either case was necessary. In this view he regarded the possession of the warehouseman as the possession, not of the vendor, but of a third party.

This was error. The warehouseman was not such a third party as dispensed with delivery and actual change of possession. The vendor had control of the property while it was stored in the warehouse. The warehouseman, in one sense, was an agent of the vendor, and his possession was that of his principal. To constitute a .change of possession, the warehouseman must at least be notified of the sale or security, and he must thereafter hold it for the vendee or mortgagee. *Wheeler v. Nichols*, 32 Me. 233; Blackb. Sale, 28; *Bentall v. Burn*, 3 Barn. & C. 423; *Cushing v. Breed*, 14 Allen, 376; *Boardman v. Spooner*, 13 Id. 353; *Appleton v. Bancroft*, 10 Metc. 236; Wood, Frauds, § 338, Browne, Frauds, § 318.

The point, hitherto, has been only inferentially passed upon by this Court. In *Sheldon v. Warner*, 26 Mich. 403, 407, it was contended that, when the mortgagee got his mortgage, the property was actually out of the possession of the mortgagor, and in that of the boom company, and that thereafter no change of possession or delivery was needed to enable him to hold against third parties. The Court said:

"But whatever view of this point may be admissible where a party other than the mortgagor has a hostile, or complete and absolute, possession, a possession which excludes the exercise by the mortgagor of control, and disables him from doing anything tantamount to an actual delivery, it appears to me that, in a case circumstanced as this is, there is no room for raising the question.

"The possession which the boom company appears to have had up to the time of the agreement with the defendants was measurably that of Burt. The nature of the property made it necessary to handle and move it through the action of this company. But whatever they did was not done strictly in the exercise of any dominion over the property. Their doings were not in contravention of any right of property,

control, or possession of Burt [the mortgagor], but were subordinate and intended to be subservient to his authority and purpose. They did not hold adversely to him, or independent of him. In a limited sense they were his agents; and, so far as the nature of the property and its position permitted a change of possession, the custody of the boom company was no obstacle to a change from Burt to the plaintiff."

*Carpenter v. Graham*, 42 Mich. 191, was a case of an absolute sale of goods stored in a warehouse. The vendors gave a written bill of sale, and notified the warehouseman of the sale. He was also notified by the purchaser, and agreed thereafter to hold the goods for the purchaser. It was held that this was a sufficient delivery and change of possession of the property, as against an execution creditor of the vendors.

These cases, and those referred to in the case last cited, settle the doctrine that the delivery must be such as the articles are capable of, and, if in the possession of an agent, such agent must be notified of the sale, and, unless he consents to act as the agent of the vendee or mortgagee, the property ought actually to be taken possession of by the purchaser or mortgagee, for the agent cannot be permitted to hold them as agent of the vendor or mortgagor. To hold that a person may place his property in the hands of his agent, and then, by secret conveyances, bid defiance to his creditors, would afford an easy evasion of the statute, and promote the evils it was intended to prevent.

When it is said that a sale or mortgage of goods in the hands of a third person is good without an actual delivery, it must be understood as referring to cases where such third person is in possession and holding adversely to the vendor or mortgagor, so that no better delivery can be made.

This was the case in *Nash v. Ely*, 19 Wend. 523, cited on plaintiff's brief. Some text-writers have failed to notice the distinction, and have laid it down broadly, from the language used by Chief Justice Nelson in that case, that, if the pur-

chaser or mortgagee finds the property in the possession of a third person when the sale or mortgage is made, he may suffer it to remain until he chooses to take the personal charge of it. And this case has been followed in *Goodwin v. Kelly*, 42 Barb. 194.

I do not intend to be understood as holding that the consent of the agent or bailee to hold the property for the purchaser or mortgagee is essential to a valid delivery. If he is notified of the transfer, he will cease to hold as the agent of the vendor, and, if he still retains possession, he will become the agent of the vendee by operation of law. *Hodges v. Hurd*, 47 Ill. 363.

The facts of this case do not bring it either within the reason or authority of those cases of grain or other commodity in a warehouse, which by the usages of trade, in commercial transactions, is treated as delivered by passing from vendor to purchaser the written evidence of title and ownership. The property sought to be sold and conveyed here were not articles of trade, but parcels of property designed for use, and which had been used by the owner in carrying on its business, and which had been stored in the warehouse for future use, when the season when it could be employed should again open.

In this case there was no such delivery and change of possession as the statute requires. The warehouseman was not notified of any sale by the transit company to the Buhl Iron Works. The property remained in the warehouse more than a month after the bill of sale before it was attached; and, so far as creditors knew, or had the means of knowledge, it remained the property of the Detroit Tug & Transit Company; and, so far as Chesebrough & Co. knew, they were holding it subject to their lien for storage for the Detroit Tug & Transit Company.

Under the testimony in this case, the defendants were

entitled to the first, second, and third requests above quoted.

The fourth request was properly refused. The sufficiency of the testimony to warrant a finding is for the jury, and it would be error for the court to instruct them in the manner requested where there was any conflicting testimony.

The judgment is reversed, and a new trial ordered.

SHERWOOD and MORSE, JJ., concurred.

CAMPBELL, C. J., did not sit.